1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

ANTHONY D. BROWN,

      Petitioner,

    v.

ROBERT A. HOREL, Warden,

      Respondent.

No. C 08-4673 LHK (PR)

**AMENDED ORDER DENYING
PETITION FOR WRIT OF HABEAS
CORPUS**

**INTRODUCTION**

This is a federal habeas corpus action filed pursuant to 28 U.S.C. § 2254 by a *pro se* state prisoner. For the reasons set forth below, the petition is DENIED.

**BACKGROUND**

In 2005, an Alameda County Superior Court jury found Petitioner guilty of first degree felony murder. The trial court sentenced Petitioner to a term of life in prison without the possibility of parole. Petitioner filed the instant federal habeas action after he was denied relief from the verdict on direct and collateral state review.

United States District Court
For the Northern District of California

Evidence presented at trial shows that in 2001, Petitioner, along with codefendants Jermaine Brooks and Derek Brown (hereafter "Derek"), shot and killed a security guard, James Miller, during the course of an attempted robbery of a "convenience" store.  The state appellate court summarized the facts as follows:

> [Alex] was working as a cashier at the 7-Eleven store at 4720 MacArthur Boulevard in Oakland on October 31, 2001.  Security guard James Miller and clerk Isayas Debessay were also present in the store about 10:30 p.m. when defendants entered . . .
>
> When Derek and [Petitioner] came up to the register, Derek took beef jerky from the counter and paid with a five-dollar bill.  [Petitioner] was next to him.  Alex placed the five-dollar bill in the cash register and took out $4.01 in change.  After closing the register, Alex turned to his right because he felt there was something going on there.  When he turned, Alex saw that Brooks was pointing a white-colored gun at Miller's head.  Believing it was a robbery, Alex raised his hands and told Miller to give up his gun.  Miller resisted and held Brooks's wrist with one hand.  It appeared to Alex that Miller was trying to take the gun from Brooks.
>
> When Alex first saw the gun, Debessay was standing next to him.  Debessay ran away to the store's office, and Alex backed away and ran behind a shelf.  From behind the shelf, he saw Derek and [Petitioner] move toward Miller.  He saw one of the defendants trying to grab Miller's gun, but could only see his hand, not his face.  The person tried once or twice to pull out the gun but was not successful.  The altercation occurred near the front door.  Seeing a chance to escape, Alex ran to the bathroom and closed the door.  From the bathroom, Alex heard a single gunshot.
>
> Debessay waited a minute or two before coming out of the office, and then called 911.  He saw Miller walking slowly out of the store.  A tape of the 911 call was played for the jury.  Debessay told the operator that somebody just shot "my security guard" and that "[h]e wants to rob us."  Alex tells the operator, "We got robbing" by "three black people."

(Ans., Ex. O at 4–5) (footnote omitted).  Miller later died.

As grounds for federal habeas relief, Petitioner alleges that (1) his sentence is unconstitutional under due process because it is unauthorized by state and federal law; (2) his conviction was not supported by sufficient evidence; (3) defense counsel rendered ineffective assistance; (4) there was instructional and verdict form error; (5) his sentence violates the Eighth Amendment; (6) the trial court violated his right to due process by admitting certain testimony; (7) the prosecutor committed misconduct; (8) the prosecution failed to disclose material evidence to the defense; and (9) he was denied his right to a fair and impartial jury.

**STANDARD OF REVIEW**

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412–13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decision but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

//
//
//
//

United States District Court
For the Northern District of California

No. C 08-4673 LHK (PR)
ORDER DENYING PETITION

United States District Court
For the Northern District of California

# DISCUSSION

## I.   Sentence Under Due Process

Petitioner claims that his sentence of life without the possibility of parole ("LWOP") is unauthorized by state and federal law. (Pet. at 6 & 6A.)  Specifically, Petitioner asserts that the California legislature created the LWOP sentence "strictly as an alternative to a sentence of death for the trier of fact to select." "It was not," Petitioner continues, "intended to serve as an option for the prosecution in cases where the prosecution has determined that death is not warranted" or "a special circumstance prosecution independent of the state's attempt to obtain a death sentence." (*Id.* at 6A.)  The prosecutor charged all defendants with the special circumstance of murder while engaged in the commission of a robbery, but the prosecutor announced at the arraignment that he would not seek to have the death penalty imposed. (Ans., Ex. O at 2.)

The state appellate court rejected Petitioner's claim on the following grounds.  First, the sentence was in fact authorized by law under the circumstances of the case, and the jury found the special circumstance allegation true.  Second, "defendants' claim is simply that their sentences were imposed in a *procedurally* flawed manner, i.e., without a penalty trial at which the jury would decide whether to impose the death penalty or an LWOP sentence." "Defendants' objection," the state court continued, "is simply that an LWOP sentence could not be imposed *without* such a procedure." (*Id.* at 36, 37.)  According to the state court, California law does not support Petitioner's reading of the statute: "If appellant's position were to prevail, a prosecutor who wanted only a sentence of life without possibility of parole would have to expose the defendant to the possibility of death in order to achieve the lesser sentence.  Absent a clear expression of legislative intent, we decline to interpret the statute as requiring such an anomalous result." (*Id.* at 38) (citation removed).

Petitioner's federal habeas claim fails.  First, it is solely a state law claim regarding state legislative intent and policy.  As Petitioner has not articulated any basis for a federal constitutional claim, the claim is then an allegation of a violation of state law, and therefore

United States District Court
For the Northern District of California

not cognizable by a federal habeas court, even if state law was erroneously applied or interpreted. *See* 28 U.S.C. § 2254(d); *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991). Second, even if his claim were cognizable, the state appellate court made it clear that it is permissible under California law for prosecutors to seek an LWOP sentence without concomitantly seeking the death penalty. (Ans., Ex. O at 38.) As the state court's interpretation of state law binds a federal court sitting in habeas corpus, *see Bradshaw v. Richey*, 546 U.S. 74, 76 (2005), this Court's inquiry is at an end. Accordingly, the claim is DENIED.

## II. Sufficiency of Evidence

Petitioner claims that there was insufficient evidence to support the jury's finding that the murder was a "special circumstance" killing. (Pet. at 6-B.) More specifically, Petitioner contends that "the evidence was insufficient to show that [P]etitioner subjectively appreciated that his conduct created a grave risk of death" in that "participation in a robbery felony-murder, by itself, is not sufficient to justify a death sentence." (*Id.*) The state appellate court rejected this claim. It's opinion on this claim is worth quoting at length:

> The People argue that evidence of the following facts, many of which were undisputed, was sufficient to support the jury's special circumstance finding against [Petitioner]: (1) the three defendants were friends; (2) [Petitioner] told the police that a week before the Oakland robbery attempt, both he and Brooks had possession of the gun used to shoot Miller; (3) Derek called the gun a "turf gun" — a gun available to all three of them; (4) the gun [Petitioner] used in the San Leandro robbery looked like the one Brooks used to shoot Miller, and all three defendants told the police it was the same gun; (5) [Petitioner] and his codefendants entered the Oakland 7-Eleven with the intent to rob the cashier; (6) [Petitioner] knew that Brooks was armed with a gun; (7) defendants knew there was a big guard in the Oakland 7-Eleven who was armed with a gun; (8) Brooks told the police that he was supposed to hold his gun on the guard and make sure the guard did not draw his gun; (9) the gun Brooks used was loaded; (10) Brooks pointed the gun at Miller and ordered him to surrender his gun; (11) after Miller refused to give up his gun and struggled with Brooks to try to take away Brooks's gun, [Petitioner] joined the struggle and tried unsuccessfully to disarm Miller; (12) after Brooks shot Miller, [Petitioner] and the other defendants ran away, leaving Miller to die.
>
> According to the People, these facts were sufficient for the jury to infer that [Petitioner] knew whether the gun was loaded when he used it the night before the shooting of Miller. Based on the facts that the robberies were similar, the gun was in fact loaded in the second robbery, the second robbery occurred only

one day after the first, and there was no evidence of anyone loading the gun between the two robberies, the People argue that the jury could reasonably have concluded that: (1) the gun was loaded when [Petitioner] used it in the first robbery, (2) [Petitioner] knew it was loaded when he used it, and (3) he therefore knew it was loaded when defendants planned and carried out the Oakland robbery attempt.

We agree with the People that the evidence was sufficient here to infer that [Petitioner] knew the gun Brooks was carrying was loaded when he entered the Oakland 7-Eleven. If so, then [Petitioner] knowingly became a major participant in a plan to use a loaded weapon to force a security guard carrying a loaded weapon to submit to a robbery. Unless his thought processes were severely stunted or impaired, this necessarily involved a subjective awareness on [Petitioner]'s part of a grave risk of death. Further, when Brooks was holding a gun on Miller and it became evident that Miller would not submit, the likelihood that Brooks would fire his gun increased. [Petitioner] further increased that risk by intervening and trying to take Miller's gun away rather than abandoning the robbery and trying to get Brooks out of the store. Finally, when Miller was shot and mortally wounded, rather than come to his aid, [Petitioner] assisted the shooter in getting away. At all of these junctures, [Petitioner]'s actions showed a reckless indifference to human life.

(Ans., Ex. O at 39–41) (footnote omitted).

A federal court reviewing collaterally a state court conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt. *Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1992). The federal court "determines only whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *See id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt, may the writ be granted. *See Jackson*, 443 U.S. at 324.

In the instant matter, in order to find the special circumstance true, Petitioner's jury had to determine that Petitioner aided and abetted the attempted robbery "with reckless indifference to human life and as a major participant." Cal. Pen. Code § 190.2(d).

Applying these legal principles to the instant action, the Court concludes the record is replete with evidence presented at trial on which a rational trier of fact could have found the special circumstance true beyond a reasonable doubt. Such evidence includes admissions by Petitioner and his codefendants that (1) they all had access to the gun, (2) Petitioner knew

United States District Court
For the Northern District of California

about the gun well before the 7-11 robbery, (3) Petitioner knew the gun was loaded at the time of the robbery; (4) Petitioner entered the store with the intention of robbing it; (5) Petitioner joined in the struggle to disarm Miller; and (6) Petitioner knew that Miller was armed. On this and the other evidence of Petitioner's knowing and willing participation in the criminal events, the Court concludes that a rational trier of fact could have found beyond a reasonable doubt that Petitioner aided and abetted the robbery with reckless indifference to human life and as a major participant. Petitioner's bare assertion that there was insufficient evidence to support the jury's finding is flatly contradicted by the record. Accordingly, the claim is DENIED.

## III.   Assistance of Counsel

### A.     Failure to Point Out Mitigating Circumstances

Petitioner claims that defense counsel rendered ineffective assistance in violation of the Sixth Amendment when he failed to point out to the jury "mitigating circumstances which could have possibly persuaded them to render a less harsh penalty th[a]n [l]ife [w]ithout [p]ossibility of [p]arole." (Pet. at 6-C.) More specifically, Petitioner contends that defense counsel failed to point out facts "upon which the jury might conclude that [P]etitioner was not aware that his own acts involved a grave risk of death," facts such as Petitioner's youth (he was 18 at the time of the offense), his intoxication during the crime (he admitted to having smoked marijuana and a half pint each of gin and Hennessy during the day of the crime), and evidence indicating that Petitioner did not know the gun was loaded. (*Id.*) The state appellate court rejected this claim on grounds that Petitioner failed "to overcome the presumption that counsel's argument reflected a reasonable tactical choice":

> In this case counsel may well have believed that arguing the special circumstance evidence at length would not have been the best trial strategy for a number of reasons. First, such a strategy would have undermined [Petitioner]'s first line of defense that he and his codefendants were not attempting to rob the store. On appeal, [Petitioner] claims that his counsel should have refuted the prosecutor's assertion that he knew the gun was loaded. But focusing the jury on that issue raises the question of how [Petitioner] even knew Brooks had a weapon on him, loaded or unloaded, if this was a shopping trip rather than an attempted robbery. He also claims

defense counsel should have made an argument that he and his codefendants did not expect the guard to resist. This too would have risked cementing or appearing to concede the evidence that this was a planned robbery. We note that Derek's counsel — with a stronger argument to make on the special circumstance issue than [Petitioner]'s — barely addressed the issue in her closing argument. Even with the benefit of hindsight, it is hard to fault the strategy of treading lightly on the evidence concerning the special circumstance allegation, even if it did not work in [Petitioner]'s case. FN21

FN21. The strategy may have come close to succeeding. As [Petitioner] himself points out, the jury wrestled with the question of whether there was an attempted robbery and at one point sent a note to the judge that it was deadlocked on the issue.

Second, [Petitioner]'s counsel may have reasonably believed that rather than get bogged down in the evidence about where the gun came from, and why [Petitioner] joined in the struggle with Miller, the special circumstance argument was strengthened by leaving the jury with one vivid point succinctly stated — comparing a "snatch and grab" robbery to a more egregious case in which the likelihood of someone being killed was much greater.

Finally, counsel may have reasonably believed that staking out the strongest possible position on the attempted robbery issue, as Derek's counsel did, might induce the jurors to "split the difference" by finding the special circumstance allegation false even if they felt constrained by the evidence to return a guilty verdict on first degree murder.

(Ans., Ex. O at 43–45).

Claims of ineffective assistance of counsel are examined under *Strickland v. Washington*, 466 U.S. 668 (1984). In order to prevail on a claim of ineffectiveness of counsel, the Petitioner must establish two factors. First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms, *id.* at 687–68, "not whether it deviated from best practices or most common custom," *Harrington v. Richter*, No. 09-587, slip op. 1 at 15 (U.S. Jan. 19, 2011) (citing *Strickland*, 466 U.S. at 650). "A court considering a claim of ineffective assistance must apply a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance." *Richter*, No. 09-587, slip op. at 14 (quoting *Strickland*, 466 U.S. at 689). Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

*Strickland*, 466 U.S. at 694.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  *Id.*  Where the defendant is challenging his conviction, the appropriate question is "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."  *Id.* at 695.

A difference of opinion as to trial tactics does not constitute denial of effective assistance, *see U.S. v. Mayo*, 646 F.2d 369, 375 (9th Cir. 1981), and tactical decisions are not ineffective assistance simply because in retrospect better tactics are known to have been available, *see Bashor v. Risley*, 730 F.2d 1228, 1241 (9th Cir. 1984).  Tactical decisions of trial counsel deserve deference when:  (1) counsel in fact bases trial conduct on strategic considerations; (2) counsel makes an informed decision based upon investigation; and (3) the decision appears reasonable under the circumstances.  *See Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994).

In the instant matter, and as regards the first *Strickland* prong, the Court concludes that the state appellate court's analysis of whether defense counsel's performance was deficient was a reasonable determination of the facts of the case, and a reasonable application of Supreme Court precedent, as the record shows.  If defense counsel had directly and thoroughly discussed the special circumstance evidence, it is reasonable to expect that the jury would draw inferences invidious to Petitioner, such as undermining his defense that there was no attempt to rob the store, and showing that Petitioner knew of the gun, regardless of whether he knew it was loaded.  As the appellate court's opinion shows, defense counsel's choice not to discuss the special circumstance evidence was a tactical decision based on strategic considerations, was reasonable under the circumstances, and therefore deserves this Court's deference.

As to the second *Strickland* prong, Petitioner has not shown that he suffered prejudice because of defense counsel's alleged failure to raise the topics of his age and intoxication. As to the question of Petitioner's age, the state court rejected such a claim, Ans., Ex. O at 41, and this Court concludes similarly that merely asserting without elaboration that one is young

is insufficient to show that defense counsel should have used such a defense, let alone that the failure to use such a defense resulted in prejudice. Petitioner must show that he was unusually immature for his age, so immature that he lacked the requisite mental capacity to appreciate the circumstances in which he found himself. This he has not done. In fact, his criminal history of juvenile crimes including theft, burglary, and robbery (including placing a gun at the cashier's head and pushing her to the ground during an armed robbery the day before the crimes at issue here) undercuts any assertion to the contrary. (Ans., Ex. O at 51.) As to the question of his intoxication, again the mere assertion that he was intoxicated is insufficient. Petitioner has not shown that his intoxication was such that he did not understand the nature and consequences of what he was doing, or that he did not have the intent to rob the store, or that he did not know of the gun. Furthermore, the evidence against Petitioner was strong, coming in the form of admissions by Petitioner himself and his codefendants. Petitioner, in a taped conversation with police, admitted that he and the others planned to rob the store; he knew Brooks had a gun; that an armed guard was stationed in the store; and he struggled with the guard to grab the guard's gun out of its holster. (Ans., Ex. O at 7–8.) Petitioner has not overcome this highly persuasive evidence of his willing and voluntary involvement in the crime by his bare assertions that defense counsel should have raised certain contentions. As Petitioner has not demonstrated either a deficient performance or prejudice, the claim is DENIED.

**B.    Failure to Object**

Petitioner claims that defense counsel rendered ineffective assistance by failing to object to a statement made by the prosecutor in her closing argument. (Pet. at 6-4.) In her closing argument, the prosecutor reviewed the evidence from the viewpoint of a customer who walked into that 7-11 store:

> [Y]ou see Derek Brown move up to the cashier, casually grabs the beef jerky. And you see [Petitioner] move up right next to him, and you see Jermaine Brooks, he's moving in closer towards — yeah, he moved towards the door, and now he's moving back towards the security guard. Then you see Jermaine Brooks pull out a gun to the security guard, and then you see Iyad Allamarri

United States District Court
For the Northern District of California

close the register, put his hands up. Then you see the security you [sic] guard trying to push the gun away from him. Then you see [Petitioner] come in and try to grab the security guard's gun out of his holster. And, by the way, you also recognize that these three defendants, you know they also robbed a 7-Eleven store just the night before. You know all of this and you see all of this.

(Ans., Ex. O at 32) (paragraph marks removed). She then concluded this review by saying:

Do you have any hesitation getting into that store? If you don't have reasonable doubt, you don't have reasonable doubt of the defendants' intent to rob the store, you don't have reasonable doubt that James Miller was killed in the commission of this attempted robbery, they are guilty, guilty of felony murder first degree, all of them; and special circumstances are true; the firearm, use enhancements, intentional discharge enhancements, arming enhancements, all true. That's the only reasonable verdicts you can come back with, ladies and gentlemen.

(*Id.* at 32–33.) Petitioner asserts that "[b]y reframing the issue as juror safety, the prosecutor misleadingly equated the jurors' hypothetical refusal to 'enter the store' with proof beyond a reasonable doubt of the defendants' guilt." (Pet. at 6-4.) Defense counsel's failure to object to this was, according to Petitioner, a violation of his right to the effective assistance of counsel. (*Id.*)

The state appellate court rejected Petitioner's ineffective assistance claim because the prosecutor's comments were not prejudicial:

First, the prosecutor did not commit misconduct by asking jurors to imagine themselves at the scene of the shooting. The argument is simply not of a nature that it would have "frightened" the jurors and caused them to disregard the evidence and the instructions they had been given. In fact, it asked the jurors, properly, to focus on the evidence that this was an attempted robbery, not a tragic accident resulting from a misunderstanding between Miller and Brooks. Brooks pulls his gun first. The clerk puts up his hands. Anthony tries to grab the security guard's gun out of his holster. The same men had robbed a 7-Eleven the night before. This is plainly an attempted robbery scenario, not the innocent mistake scenario Brooks had described. The prosecutor did not commit misconduct by asking the jurors to imagine how they would interpret these events using their common sense, if the events unfolded in real time before them.

Second, the prosecution's argument also did not prejudicially distort its burden of proof. It is true that immediately after asking, "Do you have any hesitation getting into that store?" the prosecutor said, "If you don't have reasonable doubt, you don't have reasonable doubt of the defendants' intent to rob the store...." In our view, there is no reasonable likelihood that jurors properly

No. C 08-4673 LHK (PR)
ORDER DENYING PETITION

United States District Court
For the Northern District of California

instructed on the burden of proof — and aware of the defense evidence and theory of the case — would have taken this to mean that they had to find defendants guilty of first degree murder if they would have hesitated to enter a store in which men were struggling over a firearm. Although slightly garbled, the prosecution's argument was not prejudicial.

(Ans., Ex. O at 33–34.)

Petitioner's claim fails because he has not shown that he was prejudiced by defense counsel's failure to object. Jurors are presumed to follow the instructions given by the trial court. *See Richardson v. Marsh*, 481 U.S. 200, 211 (1987). In the instant matter, the trial court, in addition to giving instructions on reasonable doubt, instructed the jurors before and after the presentation of evidence that they "must accept and follow the law as I state it to you . . . If anything concerning the law said by the attorneys in their arguments or at any other time during the trial conflicts with my instructions on the law, you must follow my instructions." (Ans., Ex. F, Vol. 3 at 552; Vol. 10 at 2152–53.) Under these legal principles and facts, this Court must presume that the jury followed the trial court's instructions and found Petitioner guilty on the correctly-articulated reasonable doubt standard. Petitioner's mere allegation that the jury misapplied the law because of the prosecutor's arguments is insufficient to overcome the *Marsh* presumption. Accordingly, Petitioner's claim is DENIED.

## IV.    Alleged Instructional and Verdict Form Error

Petitioner claims that the trial court violated his constitutional rights when it failed to give as an instruction CALJIC No. 8.83.1, which instructs the jury on the use of circumstantial evidence in proving the mental state for murder with special circumstances. (Pet. at 6-1.) Petitioner also alleges that "a crucial portion of CALJIC [No.] 4.21 was wrongly omitted," "CALJIC [No.] 8.81.17[2] was unnecessary," and the "verdict form was erroneous." (*Id.*) The Court will address these claims in turn.

When addressing a claim of instructional error, the only question for a federal habeas court is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Estelle v. McGuire*, 502 U.S. 62, 72 (1991), quoting *Cupp*

United States District Court
For the Northern District of California

*v. Naughten*, 414 U.S. 141, 147 (1973). "It is well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." *Id.*, quoting *Cupp*, 414 U.S. at 147.

### A.   CALJIC No. 8.83.1

Petitioner claims that the trial court violated his constitutional rights by failing to give the jury CALJIC No. 8.83.1. The state appellate court rejected this claim, on grounds that it was duplicative of jury instructions that were given:

> Regarding the failure to give CALJIC No. 8.83.1, the trial court did give a very similar instruction, CALJIC No. 8.83. [Footnote removed.] Defendants claim that the latter instruction was inadequate because it does not focus specifically on the use of circumstantial evidence to prove the mental state element of the special circumstance. Instead, it instructs the jury generally on the use of circumstantial evidence to prove a special circumstance. We do not find this distinction material because there is no reasonable likelihood that the jury believed CALJIC No. 8.83 applied to circumstantial evidence of the special circumstance allegation but not to circumstantial evidence of the mental state required for the allegation to be found true. Certainly, the instruction given gave defense counsel every opportunity to emphasize in argument, had they chosen to do so, that the instruction applied to circumstantial evidence of the required mental state.
>
> We note that the court also gave CALJIC No. 2.02 [footnote removed] as well as CALJIC No. 3.31 (concurrence of act and specific intent). Although CALJIC No. 2.02 at one point references the "crime charged," its language otherwise tracks CALJIC No. 8.83.1. The combination of CALJIC Nos. 2.02 and 3.31 with CALJIC No. 8.83 has been upheld by our Supreme Court against a claim that the trial court had a *sua sponte* duty to give CALJIC No. 8.83.1. [Citation removed.] The Supreme Court also found that "[t]he absence of a duplicative instruction specifically linking the use of circumstantial evidence of specific intent to the determination of the truth of the special circumstance allegations" was not prejudicial. [Citation removed.] We find no error or prejudice here in the use of CALJIC No. 8.83 in lieu of CALJIC No. 8.83.1.

(Ans., Ex. O at 46–47.)

CALJIC No. 8.83, as read to Petitioner's jury, is as follows:

> You are not permitted to find a special circumstance alleged in this case to be true based on circumstantial evidence unless the proved circumstance is not only (1) consistent with the theory that a special circumstance is true, but (2) cannot be reconciled with any other rational conclusion.
>
> Further, each fact which is essential to complete a set of circumstances necessary to establish the truth of a special circumstance must be proved beyond a reasonable doubt.

No. C 08-4673 LHK (PR)
ORDER DENYING PETITION

In other words, before an inference essential to establish a special circumstance may be found to have been proved beyond a reasonable doubt, each fact or circumstance upon which that inference necessarily rests must be proved beyond a reasonable doubt.

Also, if the circumstantial evidence is susceptible of two reasonable interpretations, one of which points to the truth of a special circumstance and the other to its untruth, you must adopt the interpretation which points to its untruth, and reject the interpretation which points to its truth.

If, on the other hand, one interpretation of that evidence appears to you to be reasonable and the other interpretation to be unreasonable, you must accept the reasonable interpretation and reject the unreasonable.

(Ans., Ex. A, Vol. 3, Part 6 at 751.) Petitioner's desired instruction, CALJIC No. 8.83.1, omits the second and third paragraphs above, and includes the following sentence: "The [specific intent] [mental state] with which an act is done may be shown by the circumstances surrounding its commission." Though this sentence does not appear in CALJIC No. 8.83, it does appear in another instruction that was given, CALJIC No. 2.02. (*Id.* at 690.)

Although Nos. 8.83 and 2.02 contain much of what No. 8.83.1 contains, Petitioner asserts that they are insufficient. According to Petitioner, No. 2.02 refers to conviction of a crime, not to a special circumstance, and No. 8.83 refers to the special circumstance generally, without reference to the mental intent element. "No instruction," Petitioner asserts, "drew the jury's attention to its consideration of circumstantial evidence with regard to the mental intent element of the special circumstance." (Pet. at 6-1.)

These claims are unavailing. First, Petitioner has not shown how the alleged defects in Nos. 8.83 and 2.02 implicate his federal constitutional rights, or, more specifically, how they deprived him of a right to a fair trial. Second, No. 2.02, entitled "Sufficiency of Circumstantial Evidence to Prove Specific Intent or Mental State," refers to "act," not "crime," contrary to Petitioner's assertion. Also, Petitioner does not explain why "crime," if it appeared as Petitioner asserts it does, is significant or deprives him of a fair trial. The first sentence of CALJIC No. 202 as given to the jury ("The specific intent or mental state with which an act is done may be shown by the circumstances surrounding the commission of the

No. C 08-4673 LHK (PR)
ORDER DENYING PETITION

act.") is plain. (Ans., Ex. O at 47 n. 27.) This instruction would be applied by a jury to any such determination, including that of a special circumstance allegation. Nothing in the instruction prevents such an application. Third, Petitioner has not shown why it is significant that No. 8.83 refers to special circumstance generally, and also fails to refer to the mental intent element. Even assuming that it is significant, No. 2.02 addresses any concern because it gives instructions of wide applicability regarding the jury's determination of mental state. On this same ground, Petitioner's assertion that no instruction drew the jury's attention to the mental element of special circumstance as it relates and arises from circumstantial evidence is flatly contradicted by the record. Accordingly, this claim is DENIED.

### B.    CALJIC No. 4.21

Petitioner claims, without elaboration, that "a crucial portion of CALJIC [No.] 4.21 ["Voluntary Intoxication — When Relevant to Specific Intent"] was wrongly omitted." (Pet. at 6-1.) Based on other portions of the record, the Court understands Petitioner to mean that the trial court omitted the part of No. 4.21 that informed the jury that it could consider his intoxication in determining whether he had the requisite mental state for the special circumstance finding. The state appellate court rejected this claim, concluding that "there was no reasonable likelihood that the jury was misled by the version [ ] given." "The instruction," the state appellate court wrote, "did not state or imply that jurors should not consider evidence of the effect of intoxication on the existence of the mental state required for a special circumstance finding. In fact, neither Brooks's nor [Petitioner's] counsel deemed the issue important enough to argue to the jury." (Ans., Ex. O at 48.)

Petitioner's claim fails. First, his claim, as stated in the petition, does not contain any argument, let alone supporting evidence, that the instruction violated his federal constitutional rights. Second, even if such an argument had been made, Petitioner's claim finds no basis in the record. Even though the instruction did not inform the jury that it could consider his intoxication as to the special circumstance, the instruction did not disallow the jury from considering such evidence. The jury was at all times free to consider the effects of

United States District Court
For the Northern District of California

No. C 08-4673 LHK (PR)
ORDER DENYING PETITION

1 Petitioner's intoxication on his mental state, and defense counsel was free to encourage the

2 jury to consider the same. Petitioner's claim is DENIED.

3    **C.    CALJIC No. 8.81.17**

4          Petitioner claims, without elaboration, that it was "unnecessary" to instruct the jury

5 with the language regarding whether the underlying felony was merely incidental to the

6 commission of the murder in the second paragraph of CALJIC No. 8.81.17, "Special

7 Circumstances — Murder in Commission of." (Pet. at 6-1.) The state appellate court

8 rejected this claim, finding that "it is incorrect to claim that the defense made no argument

9 that the underlying felony was merely incidental to the commission of the murder.

10 Defendant Brooks did in fact make that very argument." (Ans., Ex. O at 49.)

11          Petitioner's claim fails. First, Petitioner contends that the second paragraph language

12 is "unnecessary," not that it was prejudicial, violated his rights, or deprived him of a fair trial.

13 Second, assuming that Petitioner had clearly made a cognizable federal habeas claim, he

14 points to nothing in the instruction that constitutes a violation of his constitutional rights.

15 The claim is DENIED.

16    **D.    Verdict Form**

17          Petitioner claims that the special circumstance verdict form was flawed because it

18 directed the jury's attention to "an unnecessary element, and away from an essential mental

19 element, on the special circumstance allegation." (Pet. at 6-1 - 6-2.) The state appellate

20 court rejected this claim, concluding that "the verdict form was not required to include each

21 and every element of the special circumstance alleged":

22          The jury was instructed that in order to find the special circumstance true it
23          must find beyond a reasonable doubt that defendants knew or were aware that
             their acts involved a grave risk of death to an innocent human being. Not only
             must we presume that the jurors followed that instruction [citation removed],
24          the record shows affirmatively that they did in fact follow it: The jury at one
             point specifically asked for clarification of the "grave risk of death" language
25          in the instruction. The verdict form was not erroneous or misleading.

26 (Ans., Ex. O at 49.)

27          Petitioner's assertions are flatly contradicted by the record. As the state appellate

28

No. C 08-4673 LHK (PR)
ORDER DENYING PETITION

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  court stated, the jury instructions clearly informed the jurors that they had to consider the

2  mental element of the special circumstance allegation, an instruction of which the jury was

3  aware, as evidenced by their asking for clarification on the issue.  On such a record, the fact

4  that the verdict form did not contain the language Petitioner desired does not constitute a

5  violation of Petitioner's federal constitutional rights.  Accordingly, the claim is DENIED.

6  ## V.      Sentence Under the Eighth Amendment

7        Petitioner claims that his LWOP sentence violates the Eighth Amendment's strictures

8  against cruel and unusual punishment.  (Pet. at 6-2.)  Petitioner bases his claim on the facts

9  that he was a teenager when the crime was committed, he was not the actual shooter, and

10 because he had no intent to kill.  (*Id.*)  The state appellate court rejected this claim, finding

11 that the LWOP sentence was not "so disproportionate . . . as to violate the state or federal

12 constitutional proscriptions against cruel or unusual punishment."  (Ans., Ex. O at 51.)  The

13 appeals court concluded that there was no evidence that Petitioner was immature for his age,

14 or that the underlying crime of robbery was "some wholly aberrational event" in his life.  (*Id.*

15 at 50.)  Not only had Petitioner admitted that he had a record of juvenile crimes including

16 theft, burglary, and robbery, but on the day before the robbery, Petitioner had "played the

17 lead role in an armed robbery in which he placed a gun at the cashier's head and pushed her

18 to the ground."  (*Id.* at 51.)

19       A criminal sentence that is not proportionate to the crime for which the defendant was

20 convicted violates the Eighth Amendment.  *Solem v. Helm*, 463 U.S. 277, 303 (1983).  Yet

21 "outside the context of capital punishment, successful challenges to the proportionality of

22 particular sentences will be exceedingly rare."  *Id.* at 289–90.  Eighth Amendment

23 jurisprudence "gives legislatures broad discretion to fashion a sentence that fits within the

24 scope of the proportionality principle — the precise contours of which are unclear."  *Lockyer*

25 *v. Andrade*, 538 U.S. 63, 76 (2003) (internal quotations and citations omitted).  Indeed, "[t]he

26 Eighth Amendment does not require strict proportionality between crime and sentence.

27 Rather, it forbids only extreme sentences that are 'grossly disproportionate' to the crime."

28

United States District Court
For the Northern District of California

1   *Ewing*, 538 U.S. at 23 (quoting *Harmelin v. Michigan*, 501 U.S. 957, 1001 (1991) (Kennedy,

2   J ., concurring)).  Where it cannot be said as a threshold matter that the crime committed and

3   the sentence imposed are grossly disproportionate, it is not appropriate to engage in a

4   comparative analysis of the sentence received by the defendant to those received by

5   other defendants for other crimes.  *See U.S. v. Harris*, 154 F.3d 1082, 1084 (9th Cir. 1998).

6          In *Harmelin*, the Supreme Court upheld a life sentence without the possibility of

7   parole for an offender who had no prior felony convictions and whose sole conviction was

8   for possessing 672 grams of cocaine.  501 U.S. at 995, 961.  In *Andrade*, the Supreme Court,

9   under the highly deferential AEDPA standard, upheld a sentence of two consecutive 25 year

10  terms for the nonviolent theft of $150 worth of videotapes.  538 U.S. at 77.

11         Applying these legal precedents, Petitioner's claim cannot succeed.  Specifically,

12  Petitioner has not shown that his sentence was grossly disproportionate to his crimes,

13  especially considering that in *Harmelin*, the Supreme Court upheld as constitutional a life

14  sentence for a nonviolent drug possession crime, and in *Andrade*, upheld a 50 year sentence

15  under a recidivist statute for a nonviolent theft crime.  If a life sentence for a nonviolent drug

16  possession crime is found not to violate the Eighth Amendment, a state court's affirmation

17  of Petitioner's LWOP sentence for his active and willing participation in an armed robbery

18  that ended in murder similarly will not rise to that level.

19         Furthermore, Petitioner has provided no legal support for his assertion that his

20  sentence was unconstitutional owing to his age or that he was not the shooter.  Specific

21  sentences may be challenged as disproportionate for categorical reasons, such as upon the

22  nature of the offense, the nature of the offender, or both.  *See Graham v. Florida*, 130 S. Ct.

23  2011, 2021, 2022 (2010).  A challenge to a category of sentences as disproportionate under

24  the Eighth Amendment is informed by objective factors to the maximum possible extent.

25  *Atkins v. Virginia*, 536 U.S. 304, 312 (2002).  Instances of clear and reliable objective

26  evidence are legislative consensus and actual sentencing practices, though a court must

27  question "whether there is a reason to disagree with the judgment reached by the citizenry

28

18

1  and its legislators." *Id.* at 313.  It is also relevant to consider whether the sentence serves the

2  penological justifications of retribution, deterrence, incapacitation and rehabilitation.

3  *Graham*, 130 S. Ct. at 2028–29.  The Supreme Court has found that specific sentences for

4  certain categories of persons do violate the Eighth Amendment.  For example, the Supreme

5  Court has found that death sentences for juveniles[1] or the mentally retarded,[2] and LWOP

6  sentences for juveniles for non-homicide convictions,[3] are categorically disproportionate and

7  therefore violate the Eighth Amendment.

8        Turning to the instant matter, not only does Petitioner not fall under any of these

9  categories, he has not shown that the nature of the offense or his own nature support a

10  finding of categorical disproportionality.  Petitioner has not shown, and the Court finds no

11  reason to adopt, a finding that Petitioner's sentence is contrary to legislative consensus or to

12  actual sentencing practices, or that the Court should disagree with the legislative consensus.

13  Petitioner was legally an adult, and had a history of serious crimes at the time of the instant

14  offenses.  Also, Petitioner is criminally liable for the actions of the shooter because, as the

15  jury found, he aided and abetted the robbery with reckless indifference to human life, and

16  was a major participant in the crime.  *See* Cal. Pen. Code § 190.2(d).  Punishing Petitioner

17  for such participation in a violent crime, the latest instance in a history of serious criminal

18  offenses, with an LWOP sentence is in accord with legislative consensus, and with actual

19  sentencing practices.  Such a serious sentence supports the penological interests in protecting

20  society from Petitioner; serves as a deterrent to others who engage, or plan to engage in,

21  serious crimes; addresses society's need for retribution for Petitioner's participation in the

22  murder; and provides Petitioner with an opportunity for rehabilitation.  Accordingly,

23  Petitioner's claim is DENIED.

24

25      [1] *Roper v. Simmons*, 543 U.S. 551 (2005).

26      [2] *Atkins v. Virginia*, 536 U.S. 304 (2002).

27      [3] *Graham*, 130 S. Ct. at 2034.

28

**United States District Court**
For the Northern District of California

No. C 08-4673 LHK (PR)
ORDER DENYING PETITION

United States District Court
For the Northern District of California

## VI.   Admission of Testimony

Petitioner claims that the trial court violated his right to due process by admitting the testimony of Detective Longmire, who vouched for the credibility of another witness, Dwayne Chandler, who had provided the police with crucial information regarding the crime, information given to him by co-defendant Brooks.  (Pet. at 6-2, 6-3; Ans., Ex. O at 6–7.) Chandler recanted his statements at trial, thereby putting his credibility at issue.  (Ans., Ex. O at 7.)  At trial, Longmire testified that he thought Chandler's information was accurate, *id.*, Ex. F, Vol. 7 at 1417, a judgment about which he felt confident because Chandler's information had been tested by a magistrate at a probable cause hearing, *id.*, Ex. F, Vol. 8 at 1701.  Petitioner contends that Longmire's statement was improper vouching because it supports the credibility of a prosecution witness through the opinion of prosecution or government figures.  (Pet. at 6-3.)  The state appellate court rejected Petitioner's claim, finding that

> Longmire's testimony on this point was admissible because it arose after Chandler had recanted his statements to the police and impliedly put the integrity of Longmire's investigation into question . . . In the context of Chandler's testimony, Longmire's statement that he found Chandler's statements to be credible, and corroborated by other information, were admissible to refute the suggestion that Longmire's dealings with Chandler undermined the reliability of the police investigation.

(Ans., Ex. O at 27.)

Petitioner's claim fails.  First, Longmire's statement did not constitute vouching. Improper vouching for the credibility of a witness occurs when the prosecutor places the prestige of the government behind the witness or suggests that information not presented to the jury supports the witness's testimony.  *United States v. Young*, 470 U.S. 1, 7 n.3, 11-12 (1985); *United States v. Parker*, 241 F.3d 1114, 1119–20 (9th Cir. 2001).  Here it was a witness, not the prosecutor, who made the statement.  Consequently, there was no vouching. Second, even if Longmire's statement constituted vouching, Petitioner has not shown that the trial court had a duty to act as his advocate when defense counsel failed to raise an objection to Longmire's statement.  The trial court had no duty to *sua sponte* stop Longmire's

United States District Court
For the Northern District of California

testimony, announce that Longmire's statement was improper, and strike it. Such an act would likely have caused the jury to pay more attention to Longmire's statement, rather than less. Third, Petitioner has failed to show that he was prejudiced by the statement. Simply put, there was significant evidence other than Chandler's testimony upon which a jury could find Petitioner guilty of the charged offense, including Petitioner's own statements, which were similar to Chandler's, and the videotape evidence. Based on the foregoing, Petitioner's claim is DENIED.

In a related claim, Petitioner claims that the trial court violated his right to due process when it failed to give the jury CALJIC No. 3.20 which instructs a juror to view the testimony of an in-custody informant (here Chandler) "with caution and close scrutiny." (Pet. at 6-3.) Without such an instruction, Petitioner contends, it was reasonably likely that the jury applied the credibility instruction that was given in a way that violates Petitioner's federal constitutional rights. (*Id.*) The state appellate court rejected this claim, concluding that because Chandler did not, as defendants conceded, meet the statutory definition of an in-custody informant ("a person . . . whose testimony is based upon statements made by the defendant while both the defendant and the informant are held within a correctional institution") "no cognizable or prejudicial error was committed in allowing Longmire's testimony and therefore no special, curative instruction was required as a result of it." (Ans., Ex. O at 28 & 29.)

Petitioner's claim is without merit. As just noted, the state appellate court concluded that there was no state law error. This Court is bound by such a determination. *See Franklin v. Henry*, 122 F.3d 1270, 1272–73 (9th Cir. 1997); *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005). (Furthermore, there is no evidence that Chandler informed on Petitioner while the two were in a correctional institution.) As Petitioner's federal claim is premised on this alleged violation of state law, his federal claim necessarily fails. Accordingly, Petitioner's claim is DENIED.

No. C 08-4673 LHK (PR)
ORDER DENYING PETITION

## VII.   Alleged Prosecutorial Misconduct

Petitioner claims that the prosecutor violated his right to due process when she committed two instances of prosecutorial misconduct:  (A) appealing to the jury's sympathy for the victim; and (B) referring to the possible consequences resulting from a verdict.  (Pet. at 6-5.)

A defendant's due process rights are violated when a prosecutor's misconduct renders a trial "fundamentally unfair."  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  Under *Darden*, the first issue is whether the prosecutor's remarks were improper; if so, the next question is whether such conduct infected the trial with unfairness.  *Tan v. Runnels*, 413 F.3d 1101, 1112 (9th Cir. 2005).  A prosecutorial misconduct claim is decided "on the merits, examining the entire proceedings to determine whether the prosecutor's remarks so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Johnson v. Sublett*, 63 F. 3d 926, 929 (9th Cir. 1995) (citation and quotation marked omitted).

### A.   Sympathy for the Victim

Petitioner claims that the prosecutor violated Petitioner's right to due process during closing argument by appealing to the jury's feelings of sympathy toward the victim, James Miller.  (Pet. at 6-5.)  For example, the prosecutor said that "James was a single father.  He worked hard to provide for his four year old daughter," that "he was a loving brother, a friend, a neighbor," and that though all they had left of Miller were photographs of his corpse, the jury should remember him as a human being.  (Ans., Ex. F, Vol. 10 at 2197–98.) When defense counsel objected to two of these comments, the trial court stated that the jury had been instructed that they were not to consider any appeals to sympathy, passion, or prejudice from the prosecution or the defense.  (*Id.* at 2197 & 2209.)

The first factor in determining the prejudicial effects of misconduct is whether the trial court issued a curative instruction.  When a curative instruction is issued, a court presumes that the jury has disregarded inadmissible evidence and that no due process

No. C 08-4673 LHK (PR)
ORDER DENYING PETITION

United States District Court
For the Northern District of California

1    violation occurred. *See Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987). This presumption

2    may be overcome if there is an "overwhelming probability" that the jury would be unable to

3    disregard evidence and a strong likelihood that the effect of the misconduct would be

4    "devastating" to the defendant. *Id.*

5        Under these legal principles, Petitioner's claim fails. First, the trial court issued

6    curative instructions immediately following defense counsel's objections. Second, before

7    and after the presentation of evidence, the trial court instructed the jury that it was to consider

8    the evidence without regard to feelings of sympathy, passion, or prejudice. (Ans., Ex. F, Vol.

9    3 at 552; Vol. 10 at 2153.) On such facts, it must be presumed that the jury disregarded the

10   prosecutor's comments and that no due process violation occurred. Petitioner's mere

11   allegation is insufficient to establish an "overwhelming probability" that the jury was unable

12   to disregard the evidence or that there was a strong likelihood that the effect of the comments

13   would be devastating to him. Accordingly, Petitioner's claim is DENIED.

14    **B.**     **Reference to Possible Consequences of Conviction**

15        Petitioner claims that the prosecutor committed misconduct by making certain

16   statements in her closing and rebuttal arguments. (Pet. at 6-5.) The state appellate court

17   summarized the relevant facts as follows:

18          The prosecutor urged the jury not to give in to any temptation to give

19      defendants "a break": "Now, as we are all human beings, we have within us a
humaneness, and the humaneness is that we can have feelings of sympathy, and

20      we want to give people a break. [¶] [I]t's so very important that you be able to
set aside those feelings — not that you don't have them, you wouldn't be

21      human if you don't have those feelings — but you must be able to set aside
those feelings and rely on the facts and the law. [¶] And the law, ladies and

22      gentlemen, is what you, each and every one of you, has promised to follow and
to obey. [¶] Now, you would not be following the law if you gave the

23      defendants a break in this case."

24      The prosecutor returned to this theme in her rebuttal argument: "[Brooks's
lawyer] is asking you to . . . give his client a break. To give him a break. Find

25      him guilty of manslaughter of at the most second-degree murder. At the most.
Find him guilty of that. Then, we can all feel good about what we have done:

26      Somebody is held libel [sic]. They all go home." Brooks's lawyer objected,
saying " 'They will all go home' " [*sic*] was a misstatement and an indication of

27      a possible penalty. The court responded, "Let's move on." The prosecutor
continued: "Now, ladies and gentlemen, if you do find [Brooks] guilty of

28

No. C 08-4673 LHK (PR)
ORDER DENYING PETITION

United States District Court
For the Northern District of California

either second-degree murder or manslaughter, make no mistake about it, you are giving him a break."

(Ans., Ex. O at 31.)  Petitioner contends that "giving him a break" and "They will all go home" improperly drew the jury's attention to the consequences of their verdict.  The state appellate court rejected this claim:

> We do not find it reasonably likely that the jury believed Brooks (or the other defendants) would "go home" if Brooks was not found guilty as charged.  In context, the prosecutor intended the word "they" to refer to those jurors who might, wrongly, go home feeling good about what they had done if they brought back a conviction on a lesser charge.  She was not referring to defendants.  It seems highly unlikely that the jury understood this to mean that defendants would go home if convicted of manslaughter or second degree murder.

> There was also nothing improper in the prosecutor's argument that the jury should not give defendant Brooks "a break" by convicting him of a lesser offense.  The thrust of her argument was that the evidence supported a conviction for first degree murder, and that if the jury found him guilty of a lesser offense, he would be getting "a break."  In context, it was not a reference to the different penal consequences of one verdict or another.

(*Id.* at 31–32.)

Petitioner has not shown that the prosecutor's comments were instances of misconduct or that the state appellate court's determination was an unreasonable interpretation of the facts.  "Giving him a break" is not improper.  It appears after the prosecutor tells the jury to ignore feelings of sympathy, which is consonant with the court's instructions.  Nor is "They all go home" improper; such statement is part of the prosecutor's larger argument that the evidence supports a conviction of the most serious offense.  Furthermore, even if these comments were improper, Petitioner has not shown that he was prejudiced by such comments, as the strong evidence of his guilt attests.  Petitioner's claim is DENIED.

## VIII.  Alleged Failure to Disclose Evidence

Petitioner claims that the prosecutor violated his right to due process by failing to provide the defense with a transcript of Chandler's testimony at an *in camera* hearing before the magistrate who issued arrest warrants for defendants.  (Pet. at 6-5.)  The state appellate court rejected this claim on grounds that the defense made no attempt to obtain the transcript

1   once they had learned of it, and that because other more powerful evidence existed, it was

2   not believable that having the transcript "in hand before or during trial would have materially

3   assisted the defense or affected the trial's outcome." (Ans., Ex. O at 53–54.) The following

4   facts are relevant to this discussion:

> The fact that the magistrate had interviewed Chandler was recorded in a log entry made by Sergeant Longmire in a follow-up investigation report, referring to Chandler as "X." [footnote removed] That four-page report was attached as an exhibit to a motion filed by [Petitioner's] counsel in June 2002 to force the disclosure of Chandler's identity. Chandler's name was disclosed to the defense by the end of April 2003. In December 2004, Brooks's counsel filed a motion seeking sanctions against the prosecution for providing late discovery of certain additional documents concerning Longmire's contacts with Chandler. Longmire's follow-up investigation report was not a subject of the motion, nor did the motion refer to or seek a transcript of Chandler's *in camera* hearing before the magistrate.

11  (Ans., Ex. O at 52.)

12      The government has an obligation to surrender favorable evidence that is "material

13  either to guilt or to punishment," even if the defendant does not request disclosure of such

14  evidence. *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *U.S v. Agars*, 427 U.S. 97, 107

15  (1976). To establish a *Brady* violation, the defendant must show that the exculpatory or

16  impeaching evidence was suppressed by the state, either willfully or inadvertently, resulting

17  in prejudice. *Morris v. Aalst*, 447 F.3d 735, 741 (9th Cir. 2006). However, where the

18  government discloses all the information necessary for the defense to discover the alleged

19  *Brady* material on its own, the government is not guilty of suppressing evidence favorable to

20  the defendant. *See United States v. Bond*, 552 F.3d 1092, 1095–96 (9th Cir. 2009); *United

21  States v. Bracy*, 67 F.3d 1421, 1428–29 (9th Cir. 1995). More specifically, if a defendant

22  knows of the existence of the evidence and his counsel could have sought it through

23  discovery and fails to do so, no *Brady* violation has occurred. *See Raley v. Ylst*, 470 F.3d

24  792, 804 (9th Cir. 2006).

25      Petitioner has not shown that a *Brady* violation occurred. Simply put, there is no

26  evidence that the government suppressed the evidence. On the contrary, the record shows

27  that the prosecution disclosed the existence of the evidence to the defense, which in turn did

28

not seek the transcript through discovery.  The record supports the following conclusions: (1) the government did not suppress the evidence; (2) Petitioner knew of the existence of the evidence; and (3) defense counsel could have obtained the evidence through discovery. Thus, there was no *Brady* violation.  Accordingly, Petitioner's claim is DENIED.

## IX.    Challenges of Potential Jurors

Petitioner claims that the prosecutor used her peremptory challenges to strike three prospective jurors — identified as Jurors B., S., and F. — on the basis of race, thereby violating his Sixth Amendment right to a jury.  (Pet. at 6-6.)  The relevant facts are as follows.  Defense counsel objected to the prosecution's use of peremptory challenges against Jurors B., S., and F, who were the sole remaining African-American prospective jurors.  The trial court asked the prosecutor to give her reasons for using her challenges:

> [Juror B]
>
> The prosecutor stated that she had numerous reasons for excusing Juror B. Juror B. was a single mother who had her first child at age 18 and her second at age 21, by different fathers.  Although Juror B. had worked for the last 12 years in a relatively conservative environment — the clerk's office of a federal bankruptcy court — the prosecutor believed that Juror B. seemed to have a very nontraditional and "kind of counter cultural" lifestyle, based on her personal appearance and lifestyle choices.  Regarding Juror B.'s personal appearance, the prosecutor cited her "red streakish hair."  She believed Juror B. was "not someone who would be . . . a conservative juror that would convict somebody."  The prosecutor was also concerned that Juror B. seemed "very eager" to get on the jury, because she had said she was "concerned about giving incorrect answers" and seemed not to be "completely candid about . . . her feelings."
>
> The defense argued that some of the prosecutor's stated reasons were contradictory insofar as Juror B. was too eager to serve on the jury but Juror R. was too reluctant.  The defense also challenged the portrayal of Juror B. as nontraditional in light of the fact that she worked for a federal court, had moved to a different community so her children could attend better schools, and described her spare time activities in her questionnaire response as staying at home with her daughters, going out with family and friends, and going to movies or church.  The defense also noted that Juror B.'s hair color was "quite a common thing today."
>
> The trial court stuck by its original ruling that defendants failed to make out a prima facie case of discrimination but commented that the issue was "much,

much closer . . . as to [Juror B.] than it was as to [Juror R.].[4]"

. . . .

[Juror S.]

As to Prospective Juror S., the prosecutor asserted that she had been charged with felony welfare fraud and perjury in 2001, eventually pleading guilty to misdemeanor welfare fraud under a plea agreement.  According to the prosecutor, Juror S. had implied that she was put in a diversion program, and was not forthright in disclosing that she had in fact sustained a criminal conviction and might have still been on probation.  The prosecutor also stated that Juror S. admitted she would have a hard time applying the felony-murder rule to an aider and abettor, although she also indicated that she would be able to follow the law.  The prosecutor pointed to several White male jurors whom she had excused for that same reason.

. . . .

[Juror F.]

As for Prospective Juror F., the prosecutor explained that she was a senior legal document specialist at a law firm and the prosecutor was concerned that the other jurors would tend to defer to lawyers or "quasi-lawyers" in deliberations.  The prosecutor pointed out that she had previously excused a court administrator who was not an actual lawyer, but who had a juris doctor degree and whose wife was a lawyer, because it was her practice to excuse all "lawyers, semi-lawyers, [and] quasi-lawyers on the panel."  She also expressed concern about Juror F.'s view that, according to statistics she had learned about in her political science classes, the criminal justice system treats minorities unfairly.  The prosecutor stated that Juror F. had initially denied holding any negative views of the criminal justice system when she first began to probe her on that subject.  As further reasons, the prosecutor expressed concern that Juror F. "perhaps oversees and possibly critiques" the work of attorneys, and might scrutinize the prosecutor's work.  According to the prosecutor, when she had jokingly asked Juror F. whether she disliked attorneys, Juror F. had not denied it.  Finally, the prosecutor was concerned that Juror F. seemed to be falling asleep for most of that afternoon's proceedings and "perhaps was not interested in the whole process."

The defense contended that Juror S. was candid in her answers about her criminal history and may have simply misunderstood the precise disposition of her prior case.  The defense also challenged the prosecutor's assertion that she excused all prospective jurors who, like Juror S., questioned the fairness of felony-murder liability for an aider and abettor, noting that Juror No. 8, who was ultimately seated as a juror, raised similar concerns.  As for Prospective Juror F., the defense argued that she said nothing to indicate any antipathy to attorneys.  She had her eyes closed at times, as did many of the prospective jurors, but she was not sleeping.

(Ans., Ex. O at 12–15) (footnotes removed).

---

[4] The striking of Juror R. was not raised as an issue in the instant action.

United States District Court
For the Northern District of California

No. C 08-4673 LHK (PR)
ORDER DENYING PETITION

The state appellate court rejected Petitioner's *Batson* claims.  As to Juror B., the appellate panel found that the trial court could reasonably have found that the prosecutor's stated reasons for excusing Juror B. were genuine. (*Id.* at 18.)  The prosecutor contended that Juror B. had a nonconformist or nontraditional lifestyle as evidenced by her red streakish hair and her having had children by two different fathers at a young age and her never having been married. (*Id.*)  It also rejected defense counsel's assertion that Juror B.'s family arrangements were similar to those of a person seated as an alternate juror. (*Id.* at 19.)  The alternate juror had lost touch with his daughter when she was 17 years old, and had had no contact with her for several years, and thus was not similar to Juror B. (*Id.* at 18–19.)

As to Juror S., the state appellate court found that the record supported the prosecutor's reasons that Juror S. had been criminally prosecuted, and that she had expressed "significant reservations" about applying the legal rules on aider and abettor liability, an issue of great importance to the case at hand. (*Id.* at 19.)  The court rejected as unpersuasive Petitioner's assertion that the prosecutor did not challenge other jurors who expressed similar reservations about aider and abettor liability. (*Id.* at 20.)  These other jurors, the court stated, had not, unlike Juror S., been criminally prosecuted, and had milder reservations about applying the aider and ability theory of criminal liability. (*Id.*)

As to Juror F., the state appellate court rejected as unpersuasive Petitioner's claim that the prosecutor did not consistently apply her professed policy of striking lawyers and semi-lawyers.  According to the prosecutor, Juror F. fell into the category of quasi-lawyers because she currently worked as a senior legal document specialist at a law firm. (Ans., Ex. O at 14, 20–21.)  Possibly comparable jurors, such as Juror T., Juror A.T., and Juror 7, lacked such a strong connection to the legal profession, as the state appellate court discussed.  Juror T., who had worked for a sheriff's department 20 years earlier for about two years and had both testified and worked as a bailiff for part of that two-year period, was not comparable. (*Id.* at 21.)  If anything, Juror T.'s background made him appealing to the prosecution, and in fact, the defense excused him. (*Id.*)  Juror A.T. was not comparable because he had left a career

United States District Court
For the Northern District of California

1   in criminal justice eight years earlier and was now employed as an airline pilot. (*Id.*) Juror

2   No. 7 was not comparable because his job as a political consultant for campaigns for judges

3   and district attorneys "does not present nearly the same risk of being attributed with special

4   expertise by fellow jurors" as Juror F., whose professional career consists of assisting

5   lawyers in handling legal cases. (*Id.* at 21.) Also, Juror F.'s opinion that the criminal justice

6   system treats minorities unfairly "further distinguished" her from other jurors. (*Id.*)

7          The use of peremptory challenges by either the prosecution or defense to exclude

8   cognizable groups from a petit jury may violate the Equal Protection Clause. *See Georgia v.*

9   *McCollum*, 505 U.S. 42, 55–56 (1992). In particular, the Equal Protection Clause forbids the

10  challenging of potential jurors solely on account of their race. *See Batson v. Kentucky*, 476

11  U.S. 79, 89 (1986). *Batson* permits prompt rulings on objections to peremptory challenges

12  pursuant to a three-step process. First, the defendant must make out a prima facie case that

13  the prosecutor has exercised peremptory challenges on the basis of race "by showing that

14  the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Id.* at

15  93–94. Second, if the requisite showing has been made, the burden shifts to the

16  prosecutor to articulate a race-neutral explanation for striking the jurors in question. *Id.* at

17  97; *Wade v. Terhune*, 202 F.3d 1190, 1195 (9th Cir. 2000). Finally, the trial court must

18  determine whether the defendant has carried his burden of proving purposeful discrimination.

19  *Batson*, 476 U.S. at 98; *Wade*, 202 F.3d at 1195. A federal habeas court need not dwell

20  on the first step of the *Batson* analysis if the matter has proceeded to the second or third step.

21  "Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and

22  the trial court has ruled on the ultimate question of intentional discrimination, the preliminary

23  issue of whether the defendant has made a prima facie showing becomes moot." *Hernandez*

24  *v. New York*, 500 U.S. 352, 359 (1991).

25         To fulfill its duty, the court must evaluate the prosecutor's proffered reasons and

26  credibility in light of the totality of the relevant facts, using all the available tools including

27  its own observations and the assistance of counsel. *Mitleider v. Hall*, 391 F.3d 1039, 1047

28

United States District Court
For the Northern District of California

(9th Cir. 2004).  A legitimate reason "is not a reason that makes sense, but a reason that does not deny equal protection." *Purkett v. Elem*, 514 U.S. 765, 769 (1995).  What matters is the "genuineness of the motive" behind the racially-neutral explanation, not "the reasonableness of the asserted nonracial motive." *Id.*  In evaluating an explanation of racial neutrality, the court must keep in mind that proof of discriminatory intent or purpose is required to show a violation of the Equal Protection Clause. *See Hernandez*, 500 U.S. at 355–62.  It also should keep in mind that a finding of discriminatory intent turns largely on the trial court's evaluation of the prosecutor's credibility. *Rice v. Collins*, 546 U.S. 333, 340–42 (2006).

The findings of the state trial court on the issue of discriminatory intent are findings of fact entitled to the presumption of correctness in federal habeas review, *see Elem*, 514 U.S. at 769, as are the findings of the state appellate court, *see Mitleider*, 391 F.3d at 1050; *Williams v. Rhoades*, 354 F.3d 1101, 1108 (9th Cir. 2004).  Under AEDPA, this means that a state court's findings of discriminatory intent are presumed sound unless a Petitioner rebuts the presumption by clear and convincing evidence. *Miller-El*, 545 U.S. at 240.  A federal habeas court may grant habeas relief only "if it was unreasonable to credit the prosecutor's race-neutral explanations for the *Batson* challenge." *Rice*, 546 U.S. at 338–41.

Applying these legal principles to the instant matter, the Court concludes that Petitioner has not rebutted the presumption that the state court's conclusion was a reasonable one, as demonstrated by an analysis under the relevant case law.  The Court need not dwell on the first step of the *Batson* analysis, whether Petitioner made a prima facie case, because (a) the prosecutor offered racially-neutral explanations for striking Jurors B., S., and F., and (b) the trial court ruled on the ultimate question of intentional discrimination.  With respect to the second *Batson* step, the Court finds nothing in the record that would support a finding that the prosecutor's decision was based on constitutionally offensive considerations.  As the state appellate court found, the prosecutor's stated reasons for the peremptory challenges were supported by the record.  As for Juror B., the record supports the prosecutor's stated reasons that Juror B. had a nontraditional lifestyle based on her hair color, and on her not

**United States District Court**
For the Northern District of California

having married even though she had two children by two different fathers at a young age. As for Juror S., the record supports the prosecutor's stated reasons that Juror S. had been criminally prosecuted and had expressed reservations about applying aider and abettor liability, a theory of criminal liability central to the trial. As to Juror F., the record supports the prosecutor's stated reason that Juror F., a senior legal document specialist at a law firm, had sufficient legal experience to be excluded pursuant to the prosecutor's policy of excluding lawyers and semi-lawyers. As to the third *Batson* step which queries whether there was intentional discrimination, Petitioner has not shown clear and convincing evidence to rebut the presumption that the trial court's determination was correct, or shown why this Court should favor Petitioner's interpretation of the record over the trial court's credibility determination.

A comparative juror analysis, which was conducted by the state appellate court in its review of Petitioner's claims, further supports this conclusion. The record supports the state appellate court's conclusions that the jurors who may at first glance have appeared similarly situated to Jurors B., S., and F. were in truth not similarly situated, and Petitioner has not offered any persuasive evidence to the contrary. As noted above, Juror B. was differently situated than the alternate juror in that there is a difference between being unmarried and the mother of two children by two different fathers at a young age, and a man who had lost touch with his daughter when she was 17 years old and had had no contact with her for several years. Juror S. was not similarly situated to other jurors who also had expressed reservations about applying aider and abettor liability in that those who had expressed reservations had not, unlike Juror S., been criminally prosecuted, and had milder reservations than Juror S. Juror F. was not similarly situated to other jurors in that she currently worked in the legal profession as a senior legal document specialist at a law firm. Taking all this into account, the Court concludes that Petitioner has not shown that his constitutional rights were violated. Accordingly, Petitioner's claim is DENIED.

No. C 08-4673 LHK (PR)
ORDER DENYING PETITION

United States District Court
For the Northern District of California

1

**CONCLUSION**

2      The state court's adjudication of the claim did not result in a decision that was

3 contrary to, or involved an unreasonable application of, clearly established federal law, nor

4 did it result in a decision that was based on an unreasonable determination of the facts in

5 light of the evidence presented in the state court proceeding.  Accordingly, the petition is

6 DENIED.

7      A certificate of appealability will not issue.  Reasonable jurists would not "find the

8 district court's assessment of the constitutional claims debatable or wrong." *Slack v.*

9 *McDaniel*, 529 U.S. 473, 484 (2000).  Petitioner may seek a certificate of appealability from

10 the Court of Appeals.

11      The Clerk shall enter judgment in favor of Respondent and close the file.

12      **IT IS SO ORDERED.**

13

14 DATED: March 15, 2011

                                 *Lucy H. Koh*

15                                LUCY H. KOH
                           United States District Judge

16

17

18

19

20

21

22

23

24

25

26

27

28

No. C 08-4673 LHK (PR)
ORDER DENYING PETITION